UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 14-14011-CIV-LYNCH

JOHNNIE TERESA MARCHISIO AND ADRIAN MARCHISIO,

    Plaintiffs,

v.

CARRINGTON MORTGAGE SERVICES, LLC,

    Defendant.

_____/



FILED by _____ D.C.

SEP 1 3 2016

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - FT. PIERCE

## ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DE 149) AND ON PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT (DE 152)

THIS CAUSE comes before this Court upon the above Motions. Having reviewed the parties' cross-motions for summary judgment, their respective responsive pleadings, and the other relevant portions of the file, this Court finds as follows:

### BACKGROUND

1.   The Plaintiffs borrowed money to buy a homestead residential property. That purchase entailed two loans. This Court will refer to them as the "First Loan" and the "Second Loan". The Plaintiffs secured these two Loans with mortgages and promissory notes. That was on February 28, 2006.

2.   On January 1, 2008 the Defendant began servicing the Loans. Regarding the nature of its business, the Defendant "agrees only that it services mortgage loans secured by real estate on behalf of lenders and/or investors". In its Response

to Plaintiffs' Statement of Undisputed Material Facts (DE 154),
the Defendant says it, however, is "unable to discern what
Plaintiffs mean by" their description of its business as
"provid[ing] financial services for lenders including credit
reporting services, collections, and lender placement of
insurance". Nor does the Defendant feel it is able to admit or
deny the accuracy of that description. The record is
nevertheless clear that the Defendant in fact did engage in all
of those activities in the handling of the Plaintiffs' account.
The simple fact remains that the Defendant did furnish
information about the Plaintiffs to the credit bureaus; did
furnish information about the Plaintiffs to the IRS; did act to
collect on debts that they believed the Plaintiffs to owe; and
through a vendor pursued forced-place insurance. The Defendant
does not dispute the fact that it engaged in those activities---
and over an extended period of time. Indeed it is this very
range of activities that underlie this lawsuit.

3.   In August 2008 the Marchisios defaulted on the two
Loans. Their default caused the range of the Defendant's
activities on the Marchisios' account to expand beyond loan
servicing to include debt collection and related activities. A
year after the default, in July 2009, the Defendant (through an
associated trustee, Wells Fargo, acting on behalf of the

Carrington Mortgage Loan Trust) sued to foreclose against the Marchisios. The trustee brought that foreclosure lawsuit in state court. On December 9, 2009, the trustee and the Marchisios settled the foreclosure lawsuit. Pursuant to the settlement agreement's terms, the Marchisios were to convey the deed to the property to Defendant Carrington in lieu of a foreclosure. In return the Defendant had to report this information to the credit bureaus. (The governing law refers to the credit bureaus---of which the main ones are Equifax, Trans Union, and Experian---as "Credit Reporting Agencies". To be consistent with how the governing law refers to them, this Court will refer to them here as "CRA's", as well.) The Defendant was to report to the CRA's the discharge of the mortgages with a $0 balance owed as of December 9, 2009. After the Defendant failed to prepare the deed in lieu of foreclosure, the Plaintiffs prepared it, themselves. They filed it with the county on December 11, 2009.

    4.   In what would become a reoccurring theme, the Defendant did not follow through with the terms of the Foreclosure Settlement Agreement. This forced the Marchisios back to the State Foreclosure Court for relief. On April 20, 2011 that court ruled in the Marchisios' favor. In its Order (found at DE 93—2), the State Foreclosure Court confirmed the transfer of full ownership of the property to the Defendant;

declared the foreclosure proceeding moot; and dismissed the foreclosure case with prejudice.

5.   In what would become the other reoccurring theme, the Defendant then resumed debt collection efforts despite the State Foreclosure Court's Order and despite the Marchisios' requests to stop. The Defendant's resumption of a variety of debt collection activities led the Marchisios to bring a lawsuit against it in this Court. See Marchisio v. Carrington Mortgage Services, Case No. 12-14264-CIV-GRAHAM/LYNCH. The Plaintiffs alleged that the Defendant had violated the Fair Credit Reporting Act, the Fair Debt Collection Practices Act, and the Florida Consumer Collection Practices Act. This is the parties' First District Court Case.

6.   Despite the filing of the Complaint and the pending lawsuit, the Defendant continued in its debt collection and related activities. It also reported inaccurate information to the Credit Reporting Agencies. On January 3, 2013 the Defendant sent an Automated Universal Data ("AUD") form[1] to the CRA's to update information about the status of the Marchisios' First Loan. In that AUD the Defendant reported that as of December 31,

---

[1] An "AUD", the Defendant explains, is the means by which furnishers transmit updated credit information to the CRA's. Furnishers use AUD's to change, modify, or update an item of a consumer's credit report. Or, a furnisher will use an AUD to communicate information to the CRA's if a consumer disputes a credit entry directly with it rather than through a CRA.

2009, the First Loan had a $0 balance; was subject to a foreclosure proceeding; and was 180 days past due at the time (that is, as of December 31, 2009). (This January 3, 2013 AUD is found at page 37 of DE 147—1.) This AUD concerned only the Marchisios' First Loan, but at least with respect to that First Loan, it presumably updated their credit report in a satisfactory manner, with accurate information.

7.   On January 23, 2013 the Marchisios and Carrington agreed to settle the case. This Settlement Agreement, that is, the settlement agreement that resolved Case No. 12-14264-CIV-GRAHAM/LYNCH, is found at DE 93—3 in this case. It was comprehensive in scope, resolving all litigation issues. Underlying the Settlement Agreement was the parties' understanding that the Marchisios owed no money against the two Loans. The Settlement Agreement, at ¶3, was meant to bring about the correction of inaccurate information that had been reported to the CRA's. The Defendant agreed to update the Second Loan with corrected, accurate information "in the same fashion" that the Defendant had done for the First Loan (via the January 3, 2013 AUD). The Defendant had to correct the Second Loan information as soon as reasonably possible but no later than 90 days. Time was of the essence. The Settlement Agreement's non-disparagement clause, at ¶7, was meant to prevent any future,

new misreporting of inaccurate information to the CRA's. The Defendant would refrain from making any statement to disparage, deprecate, or denigrate the Marchisios with respect to any subject matter of the District Court Case.

8.    The above litigation history is critical to this Court's analysis. In its discussion below this Court frequently refers to this case's "litigation history". This Court does so as a shorthand way of referring to the various court orders and settlement agreements up to this point in time. This body of rulings and settlements re-defined the parties' legal relationship and clarified their obligations to each other.

9.    The Defendant relied on its legal department to convey the various terms of the Settlement Agreement and to bring about compliance. Ms. Tracy McShane was the head of the Defendant's legal department. The adequacy of the Defendant's efforts to comply with the Settlement Agreement is a dispositive issue in this lawsuit. This Court discusses those efforts in its analysis below.

10.    Despite the Settlement Agreement and its resolution of the First District Court Case, the Defendant continued to send negative and inaccurate information to the CRA's. These consisted of automated reports sent on February 11, 2013, March 11, 2013, and April 10, 2013. (See ¶21 of DE 150.) At page 9 of

their Response (DE 160), the Plaintiffs complain that these negative reports caused their credit history still to show: "Second Loan being reported as 180+ days delinquent, that a balance of $61,356 was due, that $14,264 was past due, that it was late 120 days and that a $34,985 balloon payment was due in March 1, 2021."

11.  The Plaintiffs attribute the Defendant's February 11, 2013 report to the adverse financing terms for the two cars they financed later that same month, on February 23rd. The Plaintiffs replaced their existing cars with two "new" used cars. They allege that they had to make larger down payments and pay higher interest rates. February 2013 also was the time when the Plaintiffs began complaining to the Defendant about its non-compliance with the District Court Case Settlement Agreement.

12.  On March 7, 2013 the Defendant issued two 1099-A tax forms (one for each of the Marchisios) on the property. (They are found at pages 78—81 of DE 147—1.) The tax filing reported the property abandoned. The Defendant gave September 20, 2012 as the date when it first learned of the abandonment; $223,067.03 as the outstanding principal balance; and $0.00 as the "fair market value of property". This Court notes that on February 28th, about a week before it filed those 1099-A forms, a broker had prepared a Broker Price Opinion report for the Defendant.

The broker had suggested a $75,000 list price for the property in "as is" condition---and thus not the $0.00 that Defendant reported to the IRS. (That BPO report is found at DE 150—5.) This Court notes that the Plaintiffs had borrowed a total of $259,000---$207,000 from the First Loan and $51,800 from the Second Loan---to buy the property.

13.   The Plaintiffs allege that in April 2013, they were denied financing to buy a new home. They attribute that denial to the Defendant's inaccurate reports to the CRA's. However, as the Defendant stresses, the Plaintiffs proffer no documentary evidence to corroborate this allegation. Mr. Marchisio alleges that in April 2013 he began to suffer from congestive heart failure and high blood pressure. He attributes his ill health to frustration in dealing with the Defendant.

14.   The Settlement Agreement's 90-day deadline for the Defendant to correct the reporting of the Plaintiffs' Second Loan came on April 23, 2013. The Defendant did not do so by this deadline, a breach which the Defendant concedes---albeit as technical, immaterial breach.

15.   That next day, on April 24th, the Plaintiffs (through their attorney) wrote the Defendant's attorney to complain about the breach. The Plaintiffs complained about the various negative entries concerning the Second Loan that still were posted to

their credit history; the Defendant's failure to "adequately fix the issue on the [First Loan] as well"; and the incorrect 1099 forms. With respect to the 1099 forms, the Plaintiffs denied ever abandoning the property. Instead they left the property to the Defendant by way of a deed in lieu of foreclosure. Moreover they left the property in December 2009 and not in September 2012, as the Defendant stated in the 1099. Lastly the Plaintiffs challenged the Defendant's representation of the property having no fair market value at all. The Plaintiffs concluded by reminding the Defendant that they "have been dealing with this same issue for over 3½ years." (This letter is found at DE 93–4.) The letter from the Plaintiffs' attorney prompted the Defendant to take corrective action.

16.  At this juncture this Court briefly reviews the way in which the Defendant oversees a debt, manages information about it, knows what actions to take to collect on it, and reports details about the debt to the CRA's. The many aspects of managing a debt and collecting payment thereon are broken down into data entry points, and those data entry points are managed in databases and through data reports. The process by which the Defendant and the CRA's communicate with each other about the details of a debt likewise is dependent on data entry and data reports, and it, too, is a highly automated process.

17.   However the Defendant has no equivalent process to translate the terms of a settled debt into data entry points and to integrate them into its data-based system of debt management. The terms of a settlement agreement instead are handled on an ad hoc basis, by the head of the legal department, and communicated personally to other department heads on a need-to-know basis. As such, in response to the Plaintiffs' letter, Ms. McShane, the head of its legal department, instructed Mark Phillips, the senior consumer research specialist, to update the CRA's with correct information about the Second Loan. As he did on January 3, 2013 for the First Loan, Mr. Phillips updated the Second Loan to show a $0 balance by way of an AUD transmission. However he left in that AUD the entry regarding a $34,985 balloon balance that is due to be paid on March 1, 2021. In this respect the information regarding the Second Loan remained incorrect. (This AUD transmission is found at page 81 of DE 147—1.) On May 2, 2013 the Defendant's legal department closed out the Plaintiffs' account in its law-based tracking system. It did so without informing the other departments.

18.   On August 13, 2013 the Plaintiffs, no longer represented by counsel and now proceeding pro se, moved to re-open the First District Court Case. The Plaintiffs complained that their credit reports still showed the status of the

mortgage account to be "Late Over 120 Days" (although the credit reports also showed a $0 balance). The Plaintiffs complained about the 1099 forms which the Defendant had not withdrawn. The Plaintiffs' pro se Motion to Re-Open is found at DE 36 in the First District Court Case, 12-14264-CIV-GRAHAM.

19.   The District Court denied the Motion to Re-Open on procedural grounds. Although the case had been closed administratively upon telephonic notice of the settlement, no closing documents had been filed. Therefore the case remained open and pending in the practical sense. The District Court gave the parties seven days to file the Settlement Agreement into the docket along with additional closing documents. The parties now did so, filing their Stipulation and Dismissal with Prejudice. Thereupon the District Court dismissed the case with prejudice, but the District Court declined to reserve jurisdiction over the Settlement Agreement. The District Court did so without depriving "the Parties of any important procedural or substantive rights" and without prejudice to the parties' ability to "bring disputes related to the Settlement Agreement" in another court, however.

20.   On October 1, 2013 the State Foreclosure Court rendered Final Judgment of Re-Foreclosure. The Final Judgment

deemed any foreclosure sale moot given that the trustee already owned the property. (That Order is found at DE 150-9.)

21.   The Plaintiffs allege that sometime during the fall of 2013, the Defendant called them four or five times. The calls were through an autodialing system, and their purpose was debt collection on the subject Loans. The calls concerned an outstanding balloon balance, and the calls threatened foreclosure, the Plaintiffs allege. There is no documentary evidence of any such calls being made, the Defendant points out, despite extensive discovery of telephone carriers. The Plaintiffs respond that by time they subpoenaed the telephone carriers, the two-year time period during which the carriers retained call records already had passed. The Defendant says it has record of only one call---made on October 23, 2013---and that was a call that the Plaintiffs had placed to it.

22.   On November 7, 2013 the Plaintiffs sought help from the CRA's. They wrote the CRA's to dispute the reporting of the mortgage entries on their credit reports. "The above listed Mortgages", they wrote, "are being inaccurately reported on my credit report and I request that these items be verified and corrected."

23.   The process by which a CRA reconciles a consumer's dispute of a credit report entry is largely automated and data

entry-dependent. The CRA translates the consumer's dispute into codes that go into an Automated Credit Dispute Verification ("ACDV") form. Through the coding the nature of the dispute is communicated to the furnisher. The ACDV forms that the CRA's prepared for the Plaintiffs noted their concerns about many aspects of the subject Loans' reporting and the accuracy of that information.

24.   A CRA sends its ADCV form to the creditor via the "e-OSCAR" system. The Defendant's research department is responsible for answering ACDV's. An employee compares the credit dispute that the ADCV presents against the Defendant's FISERV database. FISERV is the Defendant's universal database that houses all relevant information regarding its borrower's loans. The Defendant says the FISERV database contains not only information about payments and delinquencies but also may contain litigation flags, settlement information, and judgments. At least with respect to their file, the Plaintiffs respond, the FISERV database contained no such settlement-related information. The employee who answered the ACDV for the Plaintiffs' credit report dispute, Mr. Danh Nguyen, saw no settlement-related information.

25.   The Defendant has a second database that an investigating employee may use if there is need to look for

additional information. It is called "Nautilus", and it stores images of documents such as loan applications, mortgages, and promissory notes. It does not store legal documents or settlement agreements, however.

26. The investigating employee answers the ACDV via the e-OSCAR system by way of another ACDV. The Defendant's responding ACDV sets forth the results of its investigation of the consumer's dispute. ACDV's are limited to addressing the credit report disputes that consumers raise with a CRA. For all other information that the Defendant sends to the CRA's about a consumer's credit information, the Defendant transmits it by way of an AUD.

27. As noted above, Mr. Nguyen was the consumer research specialist who answered the ACDV. He did so using the standard procedure of comparing the ACDV against the Defendant's FISERV database looking for any discrepancies. He sent the responding ACDV back to the CRA's that same day. Such inquiries take about ten minutes to complete on average.

28. The Plaintiffs complain about the sufficiency of the Defendant's investigation of the ACDV. Instead of taking the opportunity to correct their credit information, the Defendant verified the incorrect information, they complain. The Plaintiffs complain of various errors in how the subject two

Loans were reported. The parties use the credit report that Experian generated on November 21, 2013 (and found at page 88 of DE 147-2) as the focal point for judging the sufficiency of the Defendant's response to the ACDV. That credit report's description of the two Loans is largely accurate: a $0 balance as of December 2009 and the deed conveyance to the Defendant. There is, however, one incorrect entry. The credit report shows a balloon payment of $34,985 on the Second Loan that will be due in March 2021. The Plaintiff's expert witness, Mr. Hendricks, confirms that the November 21, 2013 credit report is correct except for the outstanding balloon payment entry. Mr. Hendricks also confirms that the payment history on the loan now is cut off at 2009.

29.   On November 29, 2013---three weeks after Mr. Nguyen had answered the ACDV---the Defendant deleted the First Loan from its "Co-Trak" database. The Second Loan remained in the Co-Trak database, however. The Co-Trak database also showed the Second Loan to have a balance due. The Second Loan's status in the Co-Trak database caused SWBC, the Defendant's vendor, to alert to it. The Second Loan now became linked to SWBC's insurance tracking system. This prompted SWBC to begin sending insurance-related letters to the Plaintiffs. The letters were sent as an automatic function of SWBC's software.

30.   The Defendant had hired Southwest Business Corp. ("SWBC") to administer the insurance aspect of its debt servicing and collecting business. Governing their relationship is the parties' Insurance Administration Agreement, docketed under seal at DE 151-1. The Defendant says that it retained SWBC to oversee the expiration and renewal of insurance policies. SWBC serves as the Defendant's exclusive insurance agent, able to place hazard insurance policies for the Defendant's real estate properties. SWBC may "force place" insurance on a property on the lender's (Defendant's) behalf while the loan remains outstanding. The contract specific to this task is an insurance policy which the Defendant refers to as its "Force Place Insurance Policy and Procedures" docketed under seal at DE 148-2. The Defendant and SWBC jointly developed the above-mentioned "Co-Trak" software to help SWBC administer the Defendant's insurance needs.

31.   SWBC sent the first letter to the Plaintiffs on November 30, 2013. The letter, sent on the Defendant's letterhead and signed by the "Fire Insurance Processing Center" of "Carrington Mortgage Services, LLC", informed the Plaintiffs that their "fire/homeowner's insurance" policy had expired on the property on December 1, 2012. The letter advised the Plaintiffs that if they did not insure the property on their

own, the lender would do so. Lender-placed insurance would cost the Plaintiffs $2,659.92 a year (for an insurance coverage amount of $235,769.00). The letter warned the Plaintiffs that late payments, missed payments, or other defaults on the account would be reported to the CRA's. The letter contained a Fair Debt Collection Practices Act "Mini Miranda" advisory describing itself as a communication from a debt collector and "for the purpose of collecting a debt". (This letter and the subsequent letters are found at DE 150—17.)

32.   SWBC sent a second letter on December 31, 2013. It likewise was sent on the Defendant's letterhead and signed in the Defendant's name. It was entitled "Second and Final Notice of Fire Insurance Requirement". It gave the Plaintiffs one more opportunity to obtain their own private insurance of the property before lender-placed insurance was instituted.

33.   The Plaintiffs filed the instant lawsuit against the Defendant. This is the third litigation between the Plaintiffs and the Defendant, and it is the second lawsuit that the Plaintiffs brought in District Court. Legal counsel filed this lawsuit on the Plaintiffs' behalf. The Plaintiffs contend that the filing of the lawsuit put the Defendant on notice that they have an attorney (and thereby requiring the Defendant to stop communicating directly with them about debt collection matters).

34.   On January 17, 2014 and again on January 22, 2014 the SWBC---on the Defendant's behalf---notified the Plaintiffs that lender-placed insurance had been instituted and sending them the bill for that coverage. The "Evidence of Insurance" that accompanied these letters identified SWBC as the insurance agency.

35.   On January 27, 2014 the Defendant called SWBC to ask whether it had mailed letters to the Plaintiffs. That same day the Defendant charged off the Second Loan balance. For the first time the FISERV database showed the Plaintiffs' account to have a $0 balance. Up to this point the FISERV database had shown a $54,083.81 balance. The Defendants explain that this database change should have ceased all tracking of the Second Loan for insurance compliance purposes and should have stopped the issuance of lender-placed insurance letters.

36.   On January 28, 2014 Ms. McShane instructed Mr. Phillips to issue an AUD to the CRA's to delete the balloon payment entry on the Plaintiffs' credit report. The Defendant thereby rectified the incorrect entry contained in the prior AUD from April 25, 2013, and it brought the Defendant now into full compliance with the Settlement Agreement.

37.   On January 29, 2014 the Defendant called SWBC about the letters. SWBC answered that it needed express instruction

from the Defendant to stop tracking the Second Loan and to stop
pursuing related insurance. Presumably the Defendant gave that
needed instruction. That same day a letter was mailed to the
Plaintiffs notifying them that the lender placed hazard
insurance had been cancelled; charges to their account had been
reversed; and a premium refund had been credited to their
account. This time the signature on the letter was simply
"Insurance Department". Attached to the letter was the same
boilerplate language that the preceding letters had carried.

## DISCUSSION

### I.   Standard of Review

38.   Rule 56, Fed.R.Civ.P., details the standard of review
for summary judgment. A party is entitled to summary judgment if
there is no genuine issue of material fact, leaving final
judgment to be decided as a matter of law. An issue of fact is
"material" if, under the applicable substantive law, it might
affect the outcome of the case. An issue of fact is "genuine" if
the record taken on the whole could lead a rational trier of
fact to find for the non-movant. See Harrison v. Culliver, 746
F.3d 1288, 1297—98 (11th Cir. 2014). What the movant may not ask
the Court to do is resolve disputes of fact or weigh
credibility.

39.   The facts are to be viewed in the light most favorable to the non-moving party, with any doubt resolved in the non-movant's favor. See Adickes v. S. H. Kress & Co., 398 U.S. 144 (1970). See Celotex Corp. v. Catrett, 477 U.S. 317 (1986). This includes inferences drawn from the facts. So long as the inferences are reasonable, see Pacific Employers Ins. Co. v. Wausau Business Ins. Co., 508 F.Supp.2d 1167, 1170 (M.D.Fla. 2007), they too are construed in the non-movant's favor and may create genuine disputes of material fact. An inference based on speculation and conjecture is not reasonable, however. See Dawkins v. Fulton County Government, 733 F.3d 1084, 1088—89 (11th Cir. 2013).

40.   If, despite the presumptions in the non-movant's favor, the movant can show the absence of any genuine dispute of material fact, then the burden of persuasion shifts to the non-movant. The non-movant must counter by demonstrating what specific facts raise a genuine issue for trial. See Stephens v. Mid-Continent Casualty Co., 749 F.3d 1318, 1321 (11th Cir. 2014). A factual dispute will preclude summary judgment if its resolution might affect the outcome of the suit under the governing law or the evidence is such that a reasonable jury could return a verdict for the non-moving party.

41.   The non-movant must counter the movant's contentions head-on. The non-movant must come forward with evidence to establish each element essential to that party's case sufficient to sustain a jury verdict. In short, this means the non-moving party must offer---and not just plead---evidence of a prima facie case. What is more the non-moving party's evidence on rebuttal must be significantly probative and not based on mere assertion or be merely colorable. See Castleberry v. Goldome Credit Corp., 408 F.3d 773, 785-86 (11th Cir. 2005). While factual averments are to be accepted as true, conclusory allegations, unwarranted inferences, or legal conclusions masquerading as facts are not. See Watts v. Fla. Int'l Univ., 495 F.3d 1289, 1295—96 (11th Cir. 2007).

42.   In short, a case may be disposed of by way of a summary ruling when a reasonable jury could not find for the non-movant based on the evidentiary record taken on the whole. See Ziegler v. Martin Cty. Sch. Dist., 2016 WL 4039667 (11th Cir. 2016), Holmes v. Jefferson Cty. Sch. Dist., 2016 WL 4056029 (11th Cir. 2016), Trask v. Sec'y, Dep't of Veterans Affairs, 822 F.3d 1179 (11th Cir. 2016), and Payroll Mgmt., Inc. v. Lexington Ins. Co., 815 F.3d 1293 (11th Cir. 2016). In this way, Rule 56 serves to eliminate the needless delay and expense to the parties and to the Court of an unnecessary trial.

## II.   **The Three Causes of Action**

43.   The dispute between the Plaintiffs and the Defendant, at its core and described simply, boils down to getting the Defendant to take action consistent with the resolution of the Foreclosure Case. However, despite the resolution of the Foreclosure Case, the Defendant continued to pursue debt collection activities against the Plaintiffs and did not fully and accurately report the Loans' status to the CRA's. This meant that the resolution of the Foreclosure Case did not bring an end to litigation between the parties. To the contrary, the litigation has continued to this day.

44.   In their Amended Complaint (DE 93) now pending in this case, the parties' Second District Court Case, the Plaintiffs frame this core dispute in three different causes of action. The Plaintiffs allege that in various ways the Defendant violated the Fair Credit Reporting Act ("FCRA"), Florida's Consumer Collections Practices Act ("FCCPA"), and breached their Settlement Agreement contract. The Plaintiffs' claims for relief arise from several different events during the course of the parties' dealings with each other. This Court addresses the Plaintiffs' claims for relief in rough chronological order of how these different events occurred. Whereas above this Court

reviews the general factual background of this lawsuit, in the below discussion this Court discusses the factual details relevant to each claim for relief.

A.   **Breach of Contract**

45.   The first event relevant to the Plaintiffs' present claims for relief is the parties' settlement of the First District Court Case and the Defendant's efforts at compliance with that Settlement Agreement. The parties executed their Settlement Agreement on January 23, 2013. The Defendant had until April 23, 2013 to comply with it. The Plaintiffs argue that the Defendants actions after January 23, 2013 breached its terms. This Court begins here with the Plaintiffs' breach of contract claim (Count III of the Amended Complaint). "For a breach of contract claim, Florida law requires the plaintiff to plead and establish: (1) the existence of a contract; (2) a material breach of that contract; and (3) damages resulting from the breach." Vega v. T-Mobile USA, Inc., 564 F.3d 1256, 1272 (11th Cir. 2009). The law of contracts applies equally to a settlement agreement. See in re Rolsafe Int'l, LLC, 477 B.R. 884, 902 (M.D.Fla. 2012).

46.   Although the law of contracts applies equally to settlement agreements, there are some additional points to

consider. This Court discusses them first, before addressing the merits of the Plaintiffs' breach of contract claim. First, there is the strong judicial policy favoring settlement agreements. To fulfill this strong policy, courts enforce them whenever possible. See in re Rolsafe, 477 B.R. at 903. See also, U.S. v. MCCI Group Holdings, LLC, 2013 WL 3991964, *3 (S.D.Fla. 2013). This Court does so here.

47.   Second, there is a jurisdictional issue. Although a settlement agreement brings an end to a lawsuit, as a contract it exists independently of that lawsuit. As such, a federal court must have jurisdiction to enforce a settlement agreement contract, just as it needs to hear any breach of contract case. See Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375 (1994). That is at issue here because the District Court Judge who heard the First District Court Case neither incorporated the parties' Settlement Agreement into a dismissal order nor reserved jurisdiction to enforce it. See Pottinger v. City of Miami, 805 F.3d 1293, 1296 (11th Cir. 2015) and Le Bon Pain, Inc. v. Guyon & Co., Inc., 720 F.Supp. 983 (S.D.Fla. 1989). Although not an issue raised by the parties, this Court has its own obligation to ensure that it has jurisdiction to hear a claim for relief. See Rule 12(h)(3), Fed.R.Civ.P. The Plaintiffs invoke this Court's supplemental jurisdiction of 28 U.S.C. §

1367 to hear the breach of contract claim. Although the Defendant's principal place of business is California, the Plaintiffs do not invoke diversity jurisdiction. This may be because although it is a California business, the State of Florida has permitted it to act as a consumer collection agency here. In any event, on the assumption that diversity jurisdiction is lacking, this Court will extend supplemental jurisdiction to hear the contract claim.

48.   Turning to the claim's merits, the Plaintiffs argue that the Defendant is in breach of their Settlement Agreement in three respects. First, the Plaintiffs argue that the Defendant did not comply with ¶3(b). Paragraph 3(b) required the Defendant to "report the Second Loan as having a zero balance as of December 9, 2009 to the same agencies and in the same fashion as it reported the First Loan". The Defendant did so in substance--although the Defendant reported the beginning date of the $0 balance as the 29th of December (rather than the 9th of December), 2009, like it was supposed to do.

49.   The Defendant complied in substance but after the deadline to do so. Paragraph 3(b) required the Defendant to comply "within 90 days", that is, by April 23, 2013. However the Defendant did not act until two days later, on April 25th. The Defendant certainly did not act "as soon as reasonably possible,

but in any case within 90 days", and thus in the spirit of the deadline. The Defendant offers no explanation for its late action other than to concede the technical breach. The overall record shows that when prompted, the Defendant is able to issue AUD's to the CRA's quickly and expeditiously.

50.  Not only did the Defendant act late, but when it did act to correct the Plaintiffs' credit report, it created a new error on their credit report. When the Defendant issued that AUD on April 25, 2013, it reported the Plaintiffs' Second Loan as having a balloon payment in the amount of $34,985 and due March 1, 2021. Given that the Plaintiffs owed no money on the Second (or First) Loan, this report was incorrect (as well as contrary to the spirit of the litigation history to-date).

51.  Nor was that the first time the Defendant erroneously reported the existence of that balloon payment obligation. After the parties executed the Settlement Agreement on January 23, 2013, the Defendant continued to report inaccurate debt obligations to the CRA's. They did so on February 11th, March 11th, and April 10th. (However, the AUD that the Defendant issued on April 25, 2013 left only one incorrect entry on their credit report. That entry would not be corrected until January 28, 2014.) The Plaintiffs argue that these three intervening reports constitute a breach of another requirement of the

Settlement Agreement. That is, the non-disparagement provision found at ¶7. The Plaintiffs argue that these intervening reports constituted "statements disparaging, deprecating, or denigrating" them on a "matter[] alleged in the Litigation." The non-disparagement obligation became effective "from the date of this Agreement", that is, on January 23, 2013. This Court therefore rejects the Defendant's argument that it had carte blanche until ¶3(b)'s deadline of April 23, 2013. One of the contract's fundamental purposes was to correct misreporting, and by this point the Defendant should have taken seriously the need for fully accurate reporting.

52.  For the Plaintiffs to obtain redress for these breaches, the breaches must have caused them actual damages. Without actual damages, the breaches are not redressable, even if the breaches were material. Although it argues it at greater length in the summary judgment briefings, the Defendant's point is that the law limits the damages that the Plaintiffs may recover to actual, that is, monetary, loss. See PNC Bank NA v. Colonial Bank, NA, 2008 WL 2917639 (M.D.Fla. 2008). The law generally does not allow the Plaintiffs to recover for emotional distress. The Plaintiffs respond that this case meets the exception when a party may recover for emotional distress on a breach of contract theory of relief. The case of Sheely v. MRI

Radiology Network, PA, 505 F.3d 1173 (11th Cir. 2007) discusses this exception, and this Court does not find the Plaintiffs to meet it here in this case. The Settlement Agreement is of a commercial nature. It does not embody the kind of "cherished rights and dignities" that Sheely contemplates. That is not to say the Plaintiffs' breach of contract claim---and the case on the whole---do not concern very important commercial and legal interests, but even so, that is insufficient.

53.  At ¶6 the Settlement Agreement permits "the prevailing party in any action commenced to enforce this Agreement" to recover "its reasonable attorneys fees, expenses, and costs" "[i]n the event of a material breach". Citing Transunion Risk & Alternative Data Sols., Inc. v. Maclachlan, 2016 WL 777091 (S.D.Fla. 2016), the Defendant argues that the fee-shifting provision of a contract is not a form of actual damages. The Plaintiffs cite no legal authority to the contrary. Nor do the Plaintiffs raise any specific performance-type argument to justify the recovery of attorney fees for enforcing a contract.

54.  There is yet a third alleged breach of the Settlement Agreement contract at issue. This alleged breach concerns the 1099 tax forms that the Defendant sent to the IRS regarding the subject property. The Plaintiffs argue that not only did the Defendant report known false information in those 1099 forms,

but that the Defendant issued those 1099 forms after promising not to do so. The Plaintiffs say that at the mediation of the First District Court Case, the Defendant had promised not to issue 1099 tax forms. The Plaintiffs cite no legal authority that allows them to base a breach of contract claim on a promise that exists outside of the four corners of a written contract.

55.   That may be why they base their argument on the non-disparagement provision of ¶7. The Defendant responds that the contract's more specific provision of ¶10, which concerns "tax reporting", trumps the more general, non-disparagement provision of ¶7. Paragraph 10 is an acknowledgement that the Defendant has not "provided any tax-related representations or advice of any kind to [them] and/or their counsel." As applied here, ¶10 of the Settlement Agreement contract supplants any tax promises made orally at the mediation. To the extent ¶10 disclaims "any tax-related representations", as a matter of contract law and contract interpretation, at least, this Court agrees with the Defendant. That written provision is broad enough to allow the Defendant to issue the 1099 forms (even if it orally had promised not to do so).

56.   While the written contract may have left the Defendant free to issue the 1099 forms, it did not give the Defendant leave to report incorrect information in a 1099 tax form. This

brings the analysis back to the non-disparagement provision of ¶7. It also brings the analysis back to the fundamental purpose of the Settlement Agreement. However, even if this Court were to find a non-disparagement violation, the Plaintiffs' breach of contract theory still would fail. This is because the Plaintiffs insufficiently argue actual damages stemming therefrom. Although the Plaintiffs make an argument about the practical effect of the 1099 forms that the Defendant issued---the Plaintiffs argue that the Defendant characterized the subject debt in a way that gives it a tax benefit and shifts the tax burden to them to bear---the Plaintiffs demonstrate no actual tax-related damages, at least on this record and on these arguments. This Court finds instead the Defendant's damages-related argument sufficient to warrant summary judgment in its favor.

57.   Consequently this Court finds the Defendant entitled to summary judgment on these three breach of contract claims. Even if the Plaintiffs demonstrate breaches of the Settlement Agreement and even if those breaches are material, the Plaintiffs make an insufficient argument for damages to survive summary judgment. This Court discusses the dispute over the sufficiency of the Plaintiffs' alleged damages in greater depth below in its consideration of the FCRA claim for relief.

B.    **The Fair Credit Reporting Act**

58.   The Plaintiffs' second theory of relief is based on
the Fair Credit Reporting Act of 15 U.S.C. § 1681, et seq.,
("FCRA"). It concerns the Defendant's investigation of their
credit history dispute. The Plaintiffs allege that the
Defendant's handling of their credit report dispute was
deficient and that it fell short of its FCRA obligations. The
credit report dispute and investigation took place after the
First District Court Case and its settlement. After the
Settlement Agreement and post-Settlement Agreement efforts had
failed to resolve the inaccurate reporting of the subject Loans,
the Plaintiffs went to the CRA's for help. On November 7, 2013
they petitioned each of the CRA's in order to dispute the
various entries that remained in their credit histories.

59.   Congress explicitly stated the importance of "fair and
accurate credit reporting"; the need for those in that industry
to "adopt reasonable procedures" to meet that goal; and for them
to handle credit-related information in a way that "is fair and
equitable to the consumer". To that end, FCRA sets forth
requirements "with regard to the confidentiality, accuracy,
relevancy, and proper utilization of such information". See 15
U.S.C. § 1681. See generally, Chi Chi Wu, Automated Injustice,
14 N.C. Banking Inst. 139 (March 2010).

60.   The Defendant is a consumer collection agency who is subject to, and obliged to comply with, FCRA. As it did for the Plaintiffs' Loans, the Defendant actively engages in the collection of consumer debts. This includes furnishing credit-related information to the credit bureaus, referred to here as CRA's. FCRA requires furnishers of credit information, such as the Defendant, to provide accurate information. See 15 U.S.C. § 1681s-2(a). Although FCRA makes clear a furnisher's duty to maintain the accuracy of the information it reports to the CRA's (and thereby maintain the integrity of credit reports for the benefit of the finance industry and for avoiding harm to consumers), a consumer's ability to sue a furnisher for redress is limited. FCRA does create a private cause of action, but it limits redress to a furnisher's response to the CRA's inquiry. See 15 U.S.C. § 1681s-2(b). See generally, Nawab v. Unifund CCR Partners, 553 Fed.Appx. 856 (11th Cir. 2013). The private cause of action in effect furthers the goal of credit report accuracy. It does so by fostering accurate verification, and in this way FCRA shifts onus onto the furnisher.

1.   Unreasonable Investigation

61.   The Plaintiffs submitted their dispute to the CRA's, and the CRA's, in turn, relayed the dispute to the Defendant for

its investigation. The CRA's communicated the dispute to the Defendant by way of an ACDV. FCRA imposed two primary duties upon the Defendant upon receipt of the ACDV's. FCRA required the Defendant to "conduct an investigation with respect to the disputed information" and to "review all relevant information provided by the [CRA's]". See 15 U.S.C. § 1681s-2(b)(1)(A)&(B). Generally speaking, the way in which the CRA relays the dispute to the furnisher defines the scope of the investigation that the furnisher is required to undertake. The scope of the dispute that the Plaintiffs raised---and which the CRA's forwarded to the Defendant for investigation---was detailed and comprehensive. It was broad enough to require the Defendant to take the Settlement Agreement---and indeed the full litigation history to-date---into consideration in its investigation.

62.   The Defendant, through one of its consumer research specialists, Mr. Nguyen, investigated the dispute. He followed the Defendant's standard procedure for investigating disputes, comparing the ACDV against the Defendant's FISERV database. Seeing no discrepancies, Mr. Nguyen verified the credit reports that the CRA's had for the Plaintiffs. The Plaintiffs complain that rather than taking this opportunity to correct inaccuracies in how the subject Loans were reported, the Defendant verified the incorrect information. The Plaintiffs complain that the

Defendant's deficient investigation meant that the subject Loans continued to be reported in an inaccurate way, even at this late juncture.

63. The Plaintiffs complain about how the credit report portrays the subject Loans. The Plaintiffs complain that it does not indicate a fully resolved debt obligation. The focus of inquiry is the credit report that Experian generated on November 21, 2013. It is this credit report that the parties checked for accuracy. The Plaintiffs' expert witness, Mr. Hendricks, sees only <u>one</u> incorrect entry in that November 21, 2013 credit report: the outstanding balloon payment. This Court limits its analysis to that entry.

64. The dispositive question therefore is: in verifying the incorrect balloon entry, did the Defendant violate 15 U.S.C. § 1681s-2(b)(1)(A)? That provision required the Defendant to "conduct an investigation with respect to the disputed information". The answer therefore depends on the quality of the Defendant's investigation of the Plaintiff's dispute. This Court begins by noting the plain language meaning of the governing provision. The plain language meaning of "conduct an investigation" implies the need for careful inquiry and action, something more than just a superficial comparison of databases. <u>See</u> <u>Chiang v. Verizon New England, Inc.</u>, 595 F.3d 26, 36—37 (1st

Cir. 2010) and <u>Johnson v. MBNA America Bank, NA</u>, 357 F.3d 426, 430—31 (4th Cir. 2004). Case law expresses this in terms of an objective "reasonable investigation" standard. That is not to say that a passive type of inquiry never can satisfy subsection (b)(1)(A), but that is not an issue here. The circumstances of the Plaintiffs' situation demanded more than a passive inquiry. <u>See</u> <u>Stroud v. Bank of America</u>, 886 F.Supp.2d 1308, 1313—14 (S.D.Fla. 2012) (noting that the reasonableness of a furnisher's investigation depends on the circumstances).

65. The core fact here is that the database information that Mr. Nguyen had available to him lacked information about the settlement that was relevant to his investigation of the ACDV. It also lacked information to alert him to seek out supplementary information. It is not that the Defendant's system of receiving ACDV's and procedure for investigating them was unreasonable in its own right. It is obvious that the Defendant does have a system for investigation credit disputes and that a designated employee, Mr. Nguyen, did undertake such an investigation. Nor is it that the Defendant lacked a system for handling the Settlement Agreement with the Plaintiffs. It is not that the Settlement Agreement never saw the light of day. The Defendant did have a system---albeit an ad hoc one---for acting upon it, and in fact it did so to some extent. Instead it was

the failure of that ad hoc system to input the Defendant's settlement obligations fully into its databases in a way that made relevant information available to all who needed access to it. The flaw, in other words, was the disconnect between the two different systems.

66.   The procedures that governed Mr. Nguyen's investigation are entirely dependent on the quality of the data entered, and the databases available to him should have contained the settlement-related information, information that the Defendant held elsewhere. Had the Defendant's ad hoc system yielded better data entry, then Mr. Nguyen would have had the information to answer the ACDV correctly. What made the Defendant's investigation of the credit dispute unreasonable also had hindered the Defendant's ability to respond effectively to the Plaintiffs' other, alternative attempts to correct how the subject Loans were being reported.

67.   Another fact affects the objective reasonableness of the Defendant's investigation. That is, the history of the parties' litigation over the subject Loans to-date. The litigation history and the various legal obligations that arose therefrom were in effect a second source of notice about the credit report dispute. The litigation history corroborated the Plaintiffs' dispute, and it should have informed the Defendant's

investigation. The problem was not that the nature of the dispute was unclear or difficult to discern. The Defendant should have been able to discover and correct the very inaccuracies that the Plaintiffs were disputing. The Defendant should have seen the need to take corrective action on the ACDV. Both the ACDV's level of detail and the independently known litigation history differentiate this case from those cases where the ADCV conveyed insufficient information to alert the furnisher to the error and to the need to investigate it further. Another distinguishing fact is that in this case, the Plaintiffs can point to what the inaccuracy was and to what more the Defendant could have done in its investigation to correct it.

68.   The Defendant defends the quality of its investigation and investigation procedures. To the extent the Defendant asserts a "bona fide error" type of defense for its handling of the credit dispute, its arguments in support thereof are unpersuasive. In any event, the Defendant furthers, the reasonableness of the investigation is better left for the jury to answer. The Defendant cites case law that left this question for the jury to answer. See Rambarran v. Bank of America, NA, 609 F.Supp.2d 1253 (S.D.Fla. 2009), Deutsch v. Arrow Fin. Servs., LLC, 2010 WL 10878520 (M.D.Fla. 2010), Rumbough v.

_Experian Info. Sols., Inc._, 2014 WL 11412831 (M.D.Fla. 2014), and _Paz v. Portfolio Recovery Assocs., LLC_, 2016 WL 1463401 (N.D.Ill. 2016). That does not mean that the issue never can be decided on summary judgment. A court may rule on any issue by way of summary judgment if there is no genuine dispute of material fact. The above-cited cases recognize this. As the _Rambarran_ court summarizes it, "numerous courts have recognized that the reasonableness of an investigation is a matter to be determined at trial, not summary judgment"---that is, "unless the facts of the case establish the reasonableness or unreasonableness of a particular investigation beyond all doubt." _Id._ at 1262. Indeed the Defendant cites cases where summary judgment was granted on this same issue---albeit in the defendants' favor. _See_, _e.g._, _Stroud_, _supra_, and _Arianas v. LVNV Funding, LLC_, 132 F.Supp.3d 1322 (M.D.Fla. 2015).

69.   The present case presents such a situation where summary judgment can be rendered on the question of "reasonable investigation". The Plaintiffs persuasively argue that on the undisputed facts, no genuine dispute remains regarding this issue. This Court finds the Plaintiffs' arguments to demonstrate that the investigation was indeed unreasonable, owing to the Defendant's inability to make critical information available to the responsible investigator. The litigation history and the

Settlement Agreement that resolved the First District Court Case compel this result and render the Defendant's cited cases distinguishable. If a defendant/furnisher can obtain summary judgment for a plaintiff/consumer's failure to comply with a contractual obligation, see Hukic v. Aurora Loan Servs., 588 F.3d 420 (7th Cir. 2009), then it stands to reason that summary judgment can be rendered in the Plaintiffs' favor here for the Defendant's failure to give full effect to the Settlement Agreement. Of the cases that the Defendant cites, Paz is most similar, but it is still distinguishable. Unlike here in this case, the defendant in Paz at least had some definite procedures for closing a case as the result of litigation and one that did not tend to hinder the availability of settlement-related information. This Court finds that the Plaintiffs meet their burden of proof of demonstrating both an unreasonable investigation and a causal link between that unreasonable investigation and the erroneous verification.

## 2.   Willfulness

70.   Having found that the Defendant did not meet its § 1681s-2(b)(1) obligation, this Court next considers the degree of that violation's egregiousness. FCRA distinguishes between a willful violation, as expressed at 15 U.S.C. § 1681n, and

negligent violation[2], as expressed at 15 U.S.C. § 1681o. Because the Plaintiffs plead only a willful violation, this Court limits its analysis to it. The concept of "willfulness" in federal common law means more than intentional misconduct. The term is broad enough to include reckless conduct, as well. A defendant's violation of FCRA is "willful" if it acted in reckless disregard of FCRA's requirements. See Collins v. Experian Info. Sols., Inc., 775 F.3d 1330, 1336 (11th Cir. 2015) (applying the more expansive, consumer-friendly definition of willfulness as clarified by the U.S. Supreme Court in Safeco Ins. Co. of Am. v. Burr, 551 U.S. 47 (2007)). As with the "reasonable investigation" element discussed above, the "willfulness" element is an objective standard. A plaintiff need not prove a defendant's actual, subjective knowledge of the risk of violation.

71.  As with the "reasonable investigation" element discussed above, it is a plaintiff's burden of proof to demonstrate "willfulness". The Plaintiffs meet this burden, and they are entitled to summary judgment in their favor. It is not that the Defendant's violation was intentional, but it does rise

---

[2] To the extent the Plaintiffs do plead a negligent violation, it is not their primary argument. Nor, given the insufficient proffer of compensatory damages and causation, would a negligence-based FCRA violation claim survive summary judgment.

to the level of recklessness. The extensive litigation history and the legal obligations that flowed therefrom heightened the need for correct reporting and heightened the need for careful investigation. The deficiencies in the Defendant's system allowed it to continue to report inaccurate information, even in response to a specific dispute, despite that litigation history. The ACDV was yet another notification of the Defendant's ongoing failure to report information that accurately reflects the subject Loans' status. The shortcomings in the system for handling settlement-related information not only led it to verify inaccurate information---but also to breach the Settlement Agreement and, as discussed below, to potentially violate Florida's Consumer Collections Practices Act ("FCCPA").

72.  This case does not present the situation of a simple, one-time mistake, or an instance of simple human error. Mr. Nguyen's ability to adequately investigate this (or any similar dispute involving litigation and a settlement agreement) was entirely dependent upon the Defendant's ad hoc system of inputting that information correctly into the databases upon which he (or any other investigator) relies. The Defendant's ad hoc system created an elevated risk that mistakes would be made or that settlement-related information would not be fully accounted for. This created an elevated risk that the Defendant

would not only report inaccurate information to the CRA's in the first place but also _verify_ that inaccurate information, all in contravention of its important settlement agreement obligations.

73.   This Court's finding of willfulness (in the form of recklessness) parallels its finding of an unreasonable investigation. The Defendant had an insufficient system to incorporate the Settlement Agreement's terms into its databases. That shortcoming hindered its employee's ability to investigate and answer the ACDV because it hindered access to important litigation-related information. The Defendant's own expert witness, Mr. Ulzheimer, said its way of restricting the information is not the industry standard, and he knows of no other debt collection firm that does the same as the Defendant. Both sides' expert witnesses agree that the better practice is to make settlement-related information readily available to an ACDV investigator. Instead the Defendant's system leaves it up to the ACDV-investigating employee to search out additional information from different departments as needed. While the investigator may have had the latitude to seek out additional information, the Defendant does not explain what existed to alert him to the need to do so. Nor does the Defendant explain how the ad hoc approach to settlement-related information can work in concert with the data entry-dependent and automated-

driven ACDV process. The Defendant's system created an unreasonable risk that an ACDV investigator would inadvertently parrot back to the CRA the same inaccurate information. Of course, had the Defendant fully complied with the Settlement Agreement contract and the litigation history to-date already by this point, there would have been no need for the Plaintiffs to petition the CRA's in the first place. All information about the subject Loans already would have been correctly reported.

74.   Nor is the ameliorating factor of prompt corrective action present here. It is true that the Defendant later issued a corrective AUD to the CRA's on January 28, 2014. That AUD caused the incorrect balloon payment entry to be removed from the Plaintiffs' credit report (and thereby bring the Defendant fully into compliance with its obligations). That corrective action was undertaken after the Plaintiffs had filed the instant lawsuit, however. The fact that it took repeat litigation to prompt corrective action demonstrates the shortcomings of the Defendant's system.

75.   The unique circumstances of this case and the strength of the Plaintiffs' proffer and arguments compel the entry of summary judgment in their favor, not only on the reasonableness element but by extension on the willfulness element, as well. Both elements are measured objectively, this Court points out.

This Court sees no genuine dispute of material fact as to either point. This Court also clarifies that it is the ad hoc system, itself, its shortcomings, and how its shortcomings spilled over into the data entry- and database-dependent system that underlie these two findings. The two findings stem from the Defendant's system, itself, and not the fault of any particular employee. That is why details concerning employee actions are of lesser importance to this analysis and why this Court does not recount that evidence in detail here.

### 3.   FCRA Damages

76.   That brings the FCRA analysis around to the question of damages. For a willful violation, § 1681n(a)(1) permits three different kinds of damages. The first of these is "actual damages". The Defendant strongly disputes whether the Plaintiffs have the kind of actual damages for which redress is available. The Plaintiffs' primary form of damages is emotional distress. In essence, the Plaintiffs seek compensation for the extreme frustration after being unable to bring all aspects of the subject Loans to conclusion. Unlike for a breach of contract, case law does permit emotional distress as a cognizable form of damages for a FCRA violation, generally speaking. However the case law is less clear about the extent to which FCRA plaintiffs

must corroborate a claim of emotional distress damages. <u>See</u>
<u>Collins</u>, 775 F.3d at 1335-36 (citing <u>Levine v. World Fin.</u>
<u>Network Nat'l Bank</u>, 437 F.3d 1118 (11th Cir. 2006) and
discussing this uncertainty). That is, the uncertainty over
whether plaintiffs may rely on their own testimony, alone, <u>see</u>
<u>Moore v. Equifax Info. Servs., LLC</u>, 333 F.Supp.2d 1360 (N.D.Ga.
2004) and <u>King v. Asset Acceptance, LLC</u>, 452 F.Supp.2d 1272
(N.D.Ga. 2006), and, if so, the degree to which plaintiffs must
articulate their claims of emotional distress damages, <u>see</u>
<u>Jordan v. Trans Union, LLC</u>, 2006 WL 1663324 (N.D.Ga. 2006) and
<u>Llewellyn v. Allstate Home Loans, Inc.</u>, 711 F.3d 1173 (10th Cir.
2013). Or, conversely, whether plaintiffs must proffer some
degree of physical injury or monetary loss to accompany their
emotional distress damages. <u>Compare</u> <u>Brim v. Midland Credit</u>
<u>Mgmt., Inc.</u>, 795 F.Supp.2d 1255 (N.D.Ala. 2011) (upholding the
jury's verdict where the jury found emotional damages but no
out-of-pocket loss) <u>with</u> <u>Sampson v. Equifax Info. Servs., LLC</u>,
2005 WL 2095092 (S.D.Ga. 2005) and <u>Taylor v. Tenant Tracker,</u>
<u>Inc.</u>, 710 F.3d 824 (8th Cir. 2013) (requiring greater
evidentiary corroboration). The case law therefore shows a split
over what evidence is needed. The <u>Rambarran</u> case, cited above,
is one of the opinions requiring a plaintiff to proffer
something more than conclusory assertions of emotional distress.

The Defendant argues that likewise the Plaintiffs here proffer insufficient corroboration to allow them to proceed.

77.   This Court does not discuss the above case law in greater depth or resolve that legal question here because it is largely a moot point. It is moot because another damages-related issue precludes the Plaintiffs' ability to survive summary judgment: the need for a causal link. See Jackson v. Equifax Info. Servs., LLC, 167 Fed.Appx. 144 (11th Cir. 2006). The Plaintiffs are limited to seeking redress for the emotional distress that occurred after the FCRA violation---that is, after the Defendant verified the incorrect balloon payment obligation in its responding ACDV to the CRA's, done on November 7, 2013. As the Defendant points out, the Plaintiffs' emotional distress began before November 7, 2013.

78.   The Plaintiffs have less to proffer by way of more concrete forms of harm, such as monetary loss. The Plaintiffs make a far lesser claim to this type of damages, and to the extent they do, there is no apparent relationship to the relevant post-November 7, 2013 time frame. This Court therefore finds the Defendant entitled to summary judgment on the issue of actual damages.

79.   The statute also allows the Plaintiffs to recovery statutory damages. Section 1681n(a)(1)(A) allows alternative

damages in an amount "of not less than $100 and not more than $1,000". This Court will leave for subsequent briefing the question of the exact amount of statutory damages to be awarded in this case. The same goes for the amount of the Plaintiffs' costs and attorney fees. Section 1681n(a)(1)(B)(3) permits an award of "the costs of the action together with reasonable attorney's fees as determined by the court" "in the case of any successful action to enforce any liability under [FCRA]".

80.   The third category of damages that § 1681n permits is punitive damages. Section 1681n(a)(1)(B)(2) permits "such amount of punitive damages as the court may allow". The Plaintiffs do not directly argue for punitive damages. Nor does this Court see any basis by which they could be awarded. The finding of willfulness is based on a finding of recklessness. That is, the heightened risk of falling short of its FCRA obligations inherent in its problematic way of accounting for settlement agreement obligations. The finding of willfulness is not based on any intentional or purposeful misdeed by the Defendant that would support the award of punitive damages.

C.   **Florida's Consumer Collections Practices Act**

81.   Lastly this Court considers the claims that the Plaintiffs raise under Florida's Consumer Collections Practices

Act, § 559.72, Fla. Stat., ("FCCPA"). This Court excludes from this part of the analysis the Plaintiffs' claims that concern credit reporting. This is because, as the Plaintiffs concede, the FCRA preempts credit reporting-based violations.

82.   Before turning to the Plaintiff's four other FCCPA-based claims for relief, this Court addresses the overarching element that the Plaintiffs must show to establish an FCCPA claim. For any conduct to be actionable under the FCCPA, the Defendant must have done it in the course of collecting a consumer debt. See Wood v. Citibank, NA, 2015 WL 3561494 (M.D.Fla. 2015) and Parker v. Midland Credit Mgmt., Inc., 874 F.Supp.2d 1353 (M.D.Fla. 2012) (discussing what satisfies the "in collecting consumer debts" element of FCCPA). For purposes of the below analysis, this Court assumes as true that this was the case for each of the four complained-of actions and that the FCCPA does apply to them. However this Court notes, at least with respect to the issuance of the 1099 tax forms, the Defendant's argument that it did not take that action in the course of collecting a debt. The Defendant argues that its issuance of the tax forms was done separate and apart from the subject Loans and the property's foreclosure.

1.   The LPI Letters

83.   The events related to this claimed FCCPA violation begin on November 29, 2013, when the Defendant deleted the Plaintiffs' First Loan from the Co-Trak software that it shares with its vendor, SWBC. That data entry change ultimately caused SWBC's software to generate a lender-placed insurance ("LPI") letter and to mail it to the Plaintiffs. Essentially, SWBC's software now believed the Plaintiffs' Second Loan to be outstanding; that it was now the Plaintiffs' only (primary) loan; and that the Plaintiffs had no hazard insurance in place to protect the underlying property. By January 22, 2014, SWBC had "force placed" its own insurance policy on the property and was billing the Plaintiffs for its cost. See generally, Rothstein v. Balboa Ins. Co., 794 F.3d 256 (2nd Cir. 2015) (explaining lender-placed hazard insurance's role in the residential mortgage business).

84.   The Plaintiffs argue that the issuance of the LPI Letters violated § 559.72(9), Fla. Stat. That provision makes it unlawful for someone to "[c]laim, attempt, or threaten to enforce a debt when such person knows that the debt is not legitimate" or for someone to "assert the existence of some other legal right when such person knows that the right does not exist." The record leaves no dispute that the "debt", whether it

be the underlying Second Loan, the need for hazard insurance, or the bill for the "forced place" insurance, was not legitimate and that the Defendant knew or should have known that it was not legitimate.

85.   The Defendant raises two defenses to this claim for relief. First, it shifts the blame to its vendor, SWBC, for taking action on the lender-placed insurance. It denies any wrongdoing on its part, and it denies any liability for SWBC's actions. This defense depends on whether the Defendant and SWBC had a principal/agent relationship. The parties argue at length whether the legal definition is met. This Court declines to resolve that particular dispute here. Nevertheless this Court notes SWBC's dependence on the Defendant both for accurate data and for instructions to take corrective action. This Court notes that SWBC did not feel it could take corrective action until January 29, 2014 when the Defendant expressly and specifically instructed it to stop. This Court makes these observations to show why, for purposes of the present analysis, this Court proceeds on the assumption that the Defendant, as the principal, can be held liable for SWBC's actions as its agent.

86.   The legal question of a principal/agent relationship need not be definitively answered here because it is a moot point. It is moot because the Defendant prevails on its other

defense. This Court finds the Defendant entitled to FCCPA's bona fide error defense at § 559.77(3), Fla. Stat. That provision provides that someone "may not be held liable in any action brought under this section if the person shows by a preponderance of the evidence that the violation was not intentional and resulted from a bona fide error, notwithstanding the maintenance of procedures reasonably adapted to avoid such error." See Edwards v. Niagara Credit Sols., Inc., 584 F.3d 1350, 1352–53 (11th Cir. 2009) and Goodin v. Bank of Am., NA, 114 F.Supp.3d 1197, 1208 (M.D.Fla. 2015) (discussing the elements of the defense).

87.   That is not to say that there are no arguments against the Defendant's reliance on the bona fide error defense. The litigation history heightened the need for the Defendant to take care with its handling of the subject Loans. Had the Defendant sufficiently translated those obligations into database entries and into its programming fully and accurately in the first place, the LPI letters likely would never have been sent. However the LPI letter error did occur in the context of corrective action. It occurred as the result of the Defendant's attempt to correct its database on November 29, 2013 (after the November 7, 2013 ACDV investigation). Moreover the Defendant did respond to it promptly. The Defendant's first notice of this

error was the filing of the instant lawsuit on January 8, 2014. On January 27, 2014 the Defendant called SWBC to correct the issue. On that same day it corrected its database in a way that it believed would end the matter. Two days later, on January 29th, when it became apparent that that database change was insufficient, the Defendant communicated additional instructions to SWBC. That resulted in SWBC issuing a corrective letter to the Plaintiffs.

### 2.   Direct Communication with a Represented Debtor

88.   At § 559.72(18), Fla. Stat., the FCCPA makes it unlawful for a debt collector to "[c]ommunicate with a debtor if the person knows that the debtor is represented by an attorney with respect to such debt and has knowledge of, or can readily ascertain, such attorney's name and address". The provision makes exceptions for this bar on direct communication with a represented debtor, but none of them are directly relevant to this analysis.

89.   The Plaintiffs base this claim for relief on the LPI letters that the Defendant/SWBC mailed them after January 8, 2014. The Plaintiffs argue that the filing of the Complaint in this litigation gave the Defendant notice that they now had legal representation. That notice, the Plaintiffs contend, meant

that the Defendant should have stopped communicating with them directly and instead through the attorney that had filed the Complaint on their behalf. The Defendant responds that it does have procedures to switch communication over to a debtor's attorney, procedures that it says comply with § 559.72(18), Fla. Stat. This Court finds the Defendant entitled to summary judgment on this claim based on the bona fide error defense of § 559.77(3), Fla. Stat. The communication at issue here are the LPI letters. The record is clear that by this point an automated system already had started to generate those letters, a system that already was up and running when the Plaintiffs filed their Complaint. The Defendant then took prompt corrective action to stop those letters. (This Court repeats that it bases its bona fide error defense ruling on the assumption that the Defendant is legally liable for the LPI letters that SWBC generated and mailed.)

90.   This Court also clarifies why it finds the Defendant entitled to the bona fide error defense with respect to these two FCCPA claims but finds the Defendant liable for a "willfully"---that is, a recklessly---unreasonable investigation of the Plaintiffs' credit report dispute. Both the FCCPA and FCRA claims originate from the same flaw in the Defendant's ability to effectuate the terms of the Settlement Agreement. The

Defendant had an inadequate means of communicating its requirements to others, in translating it into credit report terms, and in translating it into database terms. However the above two FCCPA-related acts occurred in a different context. They occurred in the course of purposeful and prompt corrective actions.

91.   This Court finds the Defendant entitled to the bona fide defense on the two above FCCPA claims. See Arnold v. Bayview Loan Servicing, LLC, 2016 WL 375154, *12 (S.D.Ala. 2016) (granting summary judgment in the defendant's favor on its entitlement to the bona fide error defense). Because the finding entitles the Defendant to relief, this Court need not resolve the parties' other disputes related to these two claims. Nor is there need for this Court to consider whether the Plaintiffs incurred any damages from these two alleged FCCPA violations.

### 3.   The Automated Dialed Calls

92.   The Plaintiffs allege that in the fall of 2013, they received several automated dialed calls that informed them of a balloon payment balance and that threatened them with foreclosure. The Plaintiffs long since had no such debt obligation, however. By that point both the State Foreclosure Case and the First District Court Case had been concluded, and

the Plaintiffs had the benefits of that litigation history. See
generally, in re Bates, 517 B.R. 395, 403 (D.N.H. 2014)
(granting summary judgment in the plaintiffs' favor as to
liability for debt collection calls that they received after the
execution of the parties' discharge injunction).

93.   The record leaves unclear the circumstances in which
these calls were placed. The only other contemporaneous action
by the Defendant occurred on October 1, 2013 when the Defendant
returned to state court to re-foreclose on the property. The
judgment of foreclose that the Defendant obtained confirmed that
the Defendant already had title to the property. Also at the
time the Plaintiffs were attempting to enforce the Settlement
Agreement. The Plaintiffs did not believe that the Defendant was
acting in accordance with it. On September 13, 2013 the District
Court told the Plaintiffs to file a breach of contract claim in
a separate lawsuit. On November 4, 2013 the Plaintiffs
petitioned the CRA's in order to dispute the ways in which the
subject Loans were being reported. The surrounding events and
circumstances therefore leave unclear why the Defendant would
have caused these calls to be placed---that is, if the calls in
fact had been made.

94.   The Defendant concedes only one telephone call between
it and the Plaintiffs during that period of time. That call was

made on October 23, 2013, and it was a call that the Plaintiffs
had placed to it. The Defendant points out that the Plaintiffs
proffer no evidence---other than their own allegation of such---
to confirm these calls that they say the Defendant placed to
them. The Plaintiffs have no evidentiary confirmation despite
extensive discovery into this matter. Citing Ellis v. England,
432 F.3d 1321, 1327 (11th Cir. 2005), Hickson Corp. v. N.
Crossarm Co., Inc., 357 F.3d 1256, 1260 (11th Cir. 2004), and
Compania de Elaborados de Cafe v. Cardinal Capital Mgmt, Inc.,
401 F.Supp.2d 1270, 1278—79 (S.D.Fla. 2003), the Defendant
argues that the Plaintiffs present an insufficient evidentiary
basis to take this claim to the jury, and therefore summary
judgment should be granted in their favor. This Court agrees.
This Court does note the Plaintiffs' response that by time they
knew to seek telephone records from the Defendant's various
vendors and carriers, the two year period for retaining call
logs had ended. This may explain the lack of confirmatory
evidence, but the fact remains that, at least on the present
record and arguments, there is an insufficient basis to let this
claim survive summary judgment. This Court adds that the
Plaintiffs do not formally plead spoliation. This Court
therefore finds summary judgment in the Defendant's favor as to

this violation, whether the Plaintiffs raise it as an FCCPA violation or a breach of contract violation.

4.   The 1099 Forms

95.   This Court now returns to the subject of the 1099 tax forms, the ones that the Defendant sent to the IRS on March 7, 2013 (and which the Defendant refuses to withdraw). The Plaintiffs complain about the issuance of those 1099's for several reasons. In issuing them, the Plaintiffs complain that the Defendant acted contrary to an oral promise it had made at mediation; used the foreclose proceeding to take a tax position advantageous to it but (potentially) at their expense; and based the 1099's on inaccurate information, to boot. At the start of this analysis, this Court addressed the Plaintiffs' argument that the Defendant issued these tax forms in breach of the parties' Settlement Agreement that resolved the First District Court Case. This Court resolved that breach of contract claim in the Defendant's favor, finding the Defendant entitled to summary judgment thereon. See generally, in re Bates, 517 B.R. 395, 402 (D.N.H. 2014) (granting the defendant summary judgment on the plaintiffs' claim that the defendant's issuance of 1099 forms to them violated the parties discharge injunction). Here, this

Court considers the Plaintiffs' argument that the Defendant's issuance of the 1099 forms violated the FCCPA.

96.   The Plaintiffs allege that the Defendant violated § 559.72(5), Fla. Stat. That provision makes it unlawful for someone to disclose to a third party "information affecting the debtor's reputation, whether or not for credit worthiness, with knowledge or reason to know . . . that the information is false." The Plaintiffs fail to state a violation of this provision for two main reasons: The Plaintiffs do not demonstrate how the 1099 filings affected their reputation. Nor do they cite legal authority to show how the filing of these tax forms is the kind of activity that subsection (5) contemplates.

97.   The Plaintiffs allege that the Defendant also violated § 559.72(6), Fla. Stat., for failing to disclose the fact that the Plaintiffs dispute the status of the debt and the reported information. The Plaintiffs do not explain where in the 1099 form the Defendant could disclose that the Plaintiffs are disputing the reported information. In any event, as the Defendant emphasizes, the Plaintiffs do not specifically plead a subsection (6) violation in their Amended Complaint; instead they raise it for the first time in these summary judgment briefings. This Court agrees with the Defendant that this precludes the Plaintiffs from pursuing their subsection (6)

claim and that summary judgment should be granted in the Defendant's favor.

98.    For the above reasons, this Court finds that summary judgment should be granted in the Defendant's favor on the Plaintiffs' claims that its issuance of the 1099 forms violated the FCCPA. That does not mean the Plaintiffs have no other means of recourse or redress. If the information reported therein is in fact inaccurate and if it does turn out to increase their tax liability, this Court presumes that the IRS offers administrative remedies for them to pursue.

## CONCLUSION

99.    Together, the parties' summary judgment motions provide extensive briefing of most of the core issues upon which this case turns. Moreover the parties' respective arguments and the submitted evidence resolve those issues. This Court sees no genuine dispute of material fact that prevents ruling by way of summary judgment. See, e.g., Dishman v. Florida, 2016 WL 4575558 (11th Cir. Sept. 2, 2016) (providing a recent application of the Rule 56 standard of review). The briefings show that of the various theories of relief that the Plaintiffs offer to account for the shortcomings in the Defendant's handling of the subject Loans, only one can prevail: their FCRA claim. The briefings are such that these rulings can be made summarily and without the

need for trial. There is no need for the parties to bear the expense of going to trial when there are no genuine disputes of material fact to try and when the disputes can be resolved summarily instead.

100. Even if the parties' summary judgment motions do not expressly address all issues in this litigation, the resolution of the issues that they do raise also directs resolution of the other remaining issues. The briefings are broad enough to permit consideration of the merits of each of the claims for relief and defenses thereto on the whole. Resolution of the issues and arguments that the parties raise in their respective summary judgment motions permit ruling on the claims on the whole. This Court sees no reason to restrict the scope of this summary judgment ruling where the resolution of the issues and arguments that the parties raise compels ruling on the claims on the whole.

It is therefore,

**ORDERED AND ADJUDGED** that the Plaintiffs' Motion for Partial Summary Judgment (DE 152) is **GRANTED**, as follows: Summary judgment is granted in the Plaintiffs' favor as to Count I of their Amended Complaint. That is, summary judgment is granted in the Plaintiffs' favor on their claim that the Defendant's November 7, 2013 investigation of their credit

report dispute was unreasonable; was "willful"; and that the Plaintiffs are entitled to statutory damages thereon. As for the amount of those statutory damages and the amount of their fees and costs, this Court creates a briefing schedule in a separate Order.

In all other respects, the Plaintiffs' Motion for Partial Summary Judgment (DE 152) is **DENIED** and the Defendant's cross-Motion for Summary Judgment (DE 149) is **GRANTED**. As such, summary judgment is granted in the Defendant's favor as to Counts II and III.

**DONE AND ORDERED** in Chambers at Fort Pierce, Florida, this 13th day of September, 2016.

_____
FRANK J. LYNCH, JR.
CHIEF UNITED STATES MAGISTRATE JUDGE

cc:  Paul Kim, Esq.
     Christopher P. Hahn, Esq.